**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 18, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.

OSAGE WIND, LLC; ENEL KANSAS, LLC; ENEL GREEN POWER NORTH AMERICA, INC.,

    Defendants - Appellees.

------------------------------

OSAGE MINERALS COUNCIL,

    Movant to Intervene - Appellant.

Nos. 15-5121 & 16-5022

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:14-CV-00704-JHP-TLW)**
_____

Jeffrey S. Rasmussen (Rebecca Sher & Peter J. Breuer with him on the briefs), Fredericks Peebles & Morgan, LLP, Louisville, Colorado, for Appellant.

Ryan A. Ray, Norman Wohlgemuth Chandler Jeter Barnett & Ray, P.C., Tulsa, Oklahoma (Lynn H. Slade & Sarah M. Stevenson, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, with him on the brief), for Appellees.

_____

Before **BRISCOE**, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

**EBEL**, Circuit Judge.

_____

This case presents the question whether a large-scale excavation project—which involved the excavation, modification, and use of rock and soil during the installation of wind turbines—constituted "mining" under the pertinent federal regulations that address mineral development on Indian land. When an entity engages in "mining" of minerals owned by the Osage Nation, a federally approved lease must be obtained from the tribe. 25 C.F.R. § 214.7. The Bureau of Indian Affairs (BIA) has defined "mining" as the "science, technique, and business of mineral development[.]" 25 C.F.R. § 211.3. We hold that the term "mineral development" has a broad meaning. While it includes commercial mineral extractions and offsite relocations, which are not at issue here, it also encompasses action upon the extracted minerals for the purpose of exploiting the minerals themselves on site.

The Osage Mineral Council (OMC), acting on behalf of the Osage Nation, appeals from the award of summary judgment to Defendant Osage Wind, LLC (Osage Wind),[1] arguing that Osage Wind engaged in "mining" without procuring a federally approved mineral lease. Appeal No. 15-5121. OMC also appeals from a separate order denying its motion to intervene below. Appeal No. 16-5022. Because we hold that OMC is a proper party to this appeal without having formally intervened

_____

[1] Osage Wind, LLC is wholly owned by Defendant Enel Kansas, LLC, which is wholly owned by Defendant Enel Green Power North America, Inc.

2

in the district court, we DISMISS as moot Appeal No. 16-5022. On the merits, we hold that Osage Wind's extraction, sorting, crushing, and use of minerals as part of its excavation work constituted "mineral development," thereby requiring a federally approved lease which Osage Wind failed to obtain. Accordingly, we REVERSE the award of summary judgment for Osage Wind in Appeal No. 15-5121, and REMAND for further proceedings consistent with this opinion.

## I.    BACKGROUND

### A. Legal Background

Congress established an Indian reservation for the Osage Nation in 1872, Act of June 5, 1872, ch. 310, 17 Stat. 228, and Oklahoma thereafter incorporated the Osage-occupied territory as Osage County, Okla. Const., art. XVII, § 8. In 1906, Congress *severed* the Osage mineral estate in Osage County from the surface estate. Act of June 28, 1906 (Osage Act), ch. 3572, 34 Stat. 539, §§ 2-3. The Osage Act parceled out the surface estate to individual tribe members—a distribution practice known as "allotment"—and made these allotted lands freely alienable. Id. § 2. The Act also ensured that the property owners could use the land for "farming, grazing, or any other purpose not otherwise" prohibited by the Osage Act. Id. § 7.

The mineral estate beneath those lands, however, was not allotted to individual members of the tribe. Id. § 3. Rather, the mineral estate was reserved for the benefit of the Osage Nation. Id. The United States was established as legal trustee for the mineral estate while the Osage Nation retained beneficial ownership. See, e.g.,

3

Osage Nation v. Irby, 597 F.3d 1117, 1120 (10th Cir. 2010). The Act further empowered the Osage Nation to issue leases for "all oil, gas, and other minerals" in the reserved mineral estate. Osage Act, 34 Stat. 539, § 3. Those leases required the approval of the U.S. Department of Interior (DOI) and were subject to further regulation by DOI rulemaking. Id.

The DOI promulgated several regulations pertinent to this case. First, 25 C.F.R. Part 211 governs the development of Indian mineral resources generally, and it provides the applicable definition of "mining" in this case:

> Mining means the *science, technique, and business of mineral development* including, but not limited to: opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals; Provided, when sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt is the subject mineral, an enterprise is considered 'mining' only if the extraction of such a mineral exceeds 5,000 cubic yards in any given year.

Id. § 211.3 (emphasis added). Because Part 211 applies broadly to all Indian lands, the parties agree that this definition governs mining activities conducted on the Osage Nation's reserved mineral estate.

Second, 25 C.F.R. Parts 226 and 214 implement the Osage Allotment Act and thus apply specifically to the Osage mineral estate. While Part 226 regulates the leasing of oil and gas resources, Part 214 governs all other resources in the mineral estate, including solid mineral resources. At issue here is 25 C.F.R. § 214.7, which provides that "*[n]o mining or work of any nature will be permitted upon any tract of land until a lease covering such tract shall have been approved by the Secretary of*

4

*the Interior* and delivered to the lessee."[2] (emphasis added). Accordingly, if Osage

Wind engaged in "mining" (as defined in § 211.3) of the Osage mineral estate, then it

was required to secure a lease from Osage Nation with approval from the United

States. The Osage Nation manages its mineral estate and enforces this lease

requirement through OMC, which is the Appellant in this case.


### B. **Factual Background**

In 2010, Osage Wind leased surface rights to approximately 8,400 acres of

private fee land in Osage County, Oklahoma, for the purpose of building a

commercial wind farm—a facility that collects and stores wind-generated electricity.

The planned wind-farm involved the installation of eighty-four wind turbines secured

in the ground by reinforced concrete foundations, underground electrical lines

running between the turbines and a substation, an overhead transmission line,

meteorological towers, and access roads. These structures would occupy around 1.5

percent of the total acreage of leased surface land. In September 2011, OMC and the

United States expressed concern that the planned project would interfere with oil and

gas production by blocking access to the mineral estate.

Acting on that concern, OMC filed a lawsuit in October 2011 to prevent Osage

Wind from constructing the proposed wind farm. See Osage Nation ex rel. Osage

---

[2] OMC does not argue on appeal that Osage Wind's activities constituted "work of any nature" under 25 C.F.R § 214.7, so we do not address the significance of that phrase in our analysis.

Minerals Council v. Wind Capital Grp., LLC, No. 11-CV-643-GFK-PJC, 2011 WL 6371384 (N.D. Okla. Dec. 20, 2011) (unreported).  In that case, OMC did *not* claim that Osage Wind's excavation of solid mineral resources required a federally approved lease under 25 C.F.R § 214.7.  Instead, OMC alleged that the planned wind farm would unlawfully deprive OMC's oil-and-gas lessees of reasonable use of the surface estate.  Wind Capital Grp., 2011 WL 6371384, at *2.  This prior litigation hinged on a federal regulation 25 C.F.R § 226.19, which is not at issue here.  Section 226.19 entitles OMC's oil-and-gas lessees to reasonable use of the surface land to support their underground oil-and-gas operations.[3]  Id.  OMC lost that case on the merits because there was no evidence that its own lessees were planning on using the surface estate in a manner that would conflict with Osage Wind's proposed use of the land.  Wind Capital Grp., 2011 WL 6371384, at *8.  OMC originally appealed but then dismissed its appeal.

Nearly two years later, in October 2013, Osage Wind initiated site preparation and road construction, and by September 2014, excavation work for the planned wind turbines began.  Each turbine required the support of a cement foundation measuring 10 feet deep and up to 60 feet in diameter.  To accommodate these foundations, Osage Wind dug large holes in the ground.  This process involved the extraction of soil, sand, and rock of varying sizes—all of which was of a common mineral variety,

---

[3] OMC also asserted in that prior litigation an equivalent state-law claim under an Oklahoma statute, Okla. Stat. tit. 52, § 803(B), which similarly entitles lessees of the mineral estate to make reasonable use of the surface estate.  Wind Capital Grp., 2011 WL 6371384, at *8-9.

6

including limestone and dolomite. Rock pieces smaller than 3 feet were crushed into even smaller sizes and then, after each foundation was poured and cured, the crushed rocks were pushed back over the hole and compacted into the excavated site. Larger rock pieces were then positioned next to the holes from which they came.

In November 2014, the United States—rather than OMC—filed suit to halt this excavation work on the basis that such sand, soil, and rock extraction by Osage Wind was "mining" under 25 C.F.R. § 211.3 and thus required a mineral lease under 25 C.F.R. § 214.7. After discovering that Osage Wind had completed excavation in late November 2014, the United States withdrew its request for an injunction and filed an amended complaint for damages based on the alleged unauthorized extraction of reserved minerals. On September 30, 2015, the district court awarded summary judgment to Osage Wind, concluding that the excavation work did not constitute "mining" under § 211.3, so Osage Wind's excavation work did not trigger the lease requirement of § 214.7. Importantly, at no time before the district court's final judgment did OMC become a formal party to the proceedings—instead it relied on the United States, as trustee for the mineral estate, to litigate the case on behalf of the tribe.

After the summary judgment order, the United States had 60 days to appeal. See Fed. R. App. P. 4(a)(1)(B). OMC did not know whether the United States intended to appeal from the adverse judgment, and repeatedly sought clarification from the government about its appeal intentions. On the *final* day of the appeal deadline, OMC received a phone call from the United States communicating the

7

government's intention not to appeal. OMC then scrambled to protect its interests. First, it filed a motion to intervene as a matter of right under Fed. R. Civ. P. 24(a). Next, minutes later, it filed a notice of appeal from the summary judgment order that was entered against the United States. Appeal No. 15-5121. On February 22, 2016, the district court denied the intervention motion for "lack of jurisdiction due to the pending [merits] appeal." JA 576. OMC then promptly appealed to our Court that decision denying its intervention motion. Appeal No. 16-5022.

## II.   DISCUSSION

Before we reach the principal question in this case, we address two threshold issues. We first hold that OMC has adequately appealed the underlying merits decision, even though it did not formally join the proceedings below. As a result of that holding, there is no need to address whether OMC properly intervened in the district court. We then conclude that Osage Wind has not established its res judicata burden of showing that OMC could have raised the instant claim in its earlier 2011 lawsuit regarding oil-and-gas interference. Finally, on the merits, we determine that Osage Wind's excavation activities constituted "mining" under § 211.3, so a federally approved lease was required under § 214.7.

### A. <u>**Right to Appeal**</u>

The instant action was initially brought by the United States as trustee for the Osage mineral estate. OMC was not a party to the proceeding below, yet it seeks to

8

appeal. When the government informed OMC on the final day of the appeal deadline that it would not appeal, OMC acted quickly: it immediately submitted an intervention motion and then, minutes later, filed a notice of appeal from the underlying lawsuit. As a strictly procedural matter, because the district court did not rule on the intervention motion before OMC filed the appeal notice, OMC was not formally a party to this lawsuit when it appealed. It is black-letter law generally that "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." Marino v. Ortiz, 484 U.S. 301, 304 (1988) (per curiam). But there is an exception to this rule for would-be appellants that have a sufficiently "unique interest" in the subject matter of the case. Plain v. Murphy Family Farms, 296 F.3d 975, 979 (10th Cir. 2002).

In Devlin v. Scardelletti, 536 U.S. 1, 14 (2002), the Supreme Court held that "nonnamed class members . . . who have objected in a timely manner to approval of [a] settlement at [a] fairness hearing have the power to bring an appeal *without first intervening*" in the underlying class action suit. (emphasis added). That is because a contrary rule "would deprive nonnamed class members of the power to preserve their own interests in a settlement that will ultimately bind them," id. at 10, and "appealing the approval of the settlement is [the appellant]'s only means of protecting himself from being bound by a disposition of his rights he finds unacceptable and that a reviewing court might find legally inadequate," id. at 10-11.

This Court extended Devlin's rationale beyond the class-action context in Plain v. Murphy Family Farms, 296 F.3d at 979-80 (10th Cir. 2002). In Plain, we

9

allowed an appeal by a decedent's children from an order apportioning damages in a wrongful-death suit, even though the children had *not successfully intervened* in the district court.[4] Id. Just as unnamed class members have a unique interest in a binding class settlement, we reasoned that the Plain children also "have a *unique interest . . .* under [State] law in the distribution of the wrongful death damage award." Id. at 979 (emphasis added).

Like the appellants in Devlin and Plain, OMC too has a unique interest in this matter. The Osage Nation (acting through OMC) in fact owns the beneficial interest in the mineral estate that is the subject of this appeal. The district court's decision effectively forced OMC to watch from the sidelines as Osage Wind disrupted the mineral estate, which is owned by OMC's tribe. OMC's interest in fighting that perceived intrusion is at least as significant as the Plain children's interest in obtaining a higher share of wrongful-death damages, or the Devlin class members' interests in challenging a binding settlement they believed was unfair.

To be sure, unlike the children in Plain, OMC did not attempt to intervene below until the eleventh hour. But that is because the United States, as trustee for the mineral estate, was representing OMC's interests all along. See Oklahoma ex rel. Edmonson v. Tyson Foods, Inc., 619 F.3d 1223, 1232 (10th Cir. 2010) ("[A] potential party could not be said to have unduly delayed in moving to intervene if its interests had been adequately represented until shortly before the motion to

---

[4] The children in Plain attempted to intervene as of right twice, but the district court denied their attempts both times. Id. at 978.

10

intervene."). It was not until the United States signaled it would not appeal that OMC acted quickly to get involved in the case. "After all, an earlier motion to intervene—when the movant's interests were adequately represented by a party—would have been denied" because Rule 24 bars intervention of right while the movant's interests are protected by an existing party. Id.; see also Fed. R. Civ. P. 24(a)(2) (granting the right of intervention to qualifying persons "unless existing parties adequately represent" them). Thus, because the United States was adequately representing OMC's interests throughout the litigation, OMC's failure to intervene earlier does not foreclose application of the unique-interest exception.

Neither does our decision in Southern Utah Wilderness Alliance v. Kempthorne, 525 F.3d 966 (10th Cir. 2008). Kempthorne involved an appeal by nonparty oil-and-gas companies from an order declaring that the Bureau of Land Management (BLM) violated procedural regulations in issuing certain leases to those companies. Id. at 967. The lessees were not parties to the litigation below; the action was brought by an environmental advocacy group against the BLM to enforce compliance with certain administrative procedures in issuing oil-and-gas leases. Id. Even though the district court's order "effectively 'froze'" the lease interests at issue, id. at 968, we held that the lessees, as nonparties, did not have a sufficiently unique interest to pursue the case themselves on appeal.

Kempthorne does not control here for at least two reasons. First, Kempthorne involved an interest shared by *both* BLM and the nonparty lessees seeking appeal: the validity of federally issued leases for oil-and-gas production. On the other hand, the

11

instant case concerns a lease-requirement for use of the Osage mineral estate—in which only Osage Nation has a reserved property interest, and the United States is involved merely as a trustee charged with protecting and advancing Osage Nation's sole beneficial interest in that property. Second, we noted in Kempthorne that the oil-and-gas lessees were not indispensable parties in the district court because the issue of the case was the vindication of a *public* right (compliance with administrative procedural requirements), rather than a right personal to the lessees. Id. at 969 n.2. But here, OMC is arguing that it had an individualized right to manage its own property, issue a lease, and require royalties for the use of its own minerals. The claim thus is not the violation of a public right which happens to affect OMC, as it was in Kempthorne, but rather a violation of a right unique to OMC established by 25 C.F.R. § 214.7. For these reasons, we decline to give controlling weight to Kempthorne and hold instead that OMC has a "unique interest" in pursuing the underlying merits case on appeal.

Although we hold that OMC has a unique interest in this case entitling it to appeal without having intervened below, we emphasize the limited nature of our decision. A generalized interest in vindicating a legal right is not enough to trigger our unique-interest exception. An interested person must have a particularized and significant stake in the appeal, and must further demonstrate cause for why he did not or could not intervene in the proceedings below. OMC's interest here is particularized and significant because the Osage Nation *owns* the beneficial interest in the mineral estate at issue. Further, OMC did not intervene below because the

12

United States was adequately representing its interests all along, and OMC could not have intervened as of right earlier because it only discovered in the very last moments that the United States was not going to appeal. In these unique circumstances, we permit OMC to go forward with this appeal.

As a result of this holding, it is not necessary to decide whether OMC properly intervened in the district court below, i.e., whether OMC satisfied the requirements of Fed. R. Civ. P. 24. That is the subject of Appeal No. 16-5022. Having concluded that OMC is properly a party to the merits appeal, we dismiss Appeal No. 16-5022 as moot.

## B. Res Judicata

In October 2011, OMC filed a lawsuit to prevent interference with oil-and-gas production under 25 C.F.R. § 226.19, which resulted in a final judgment on the merits against OMC. In that prior litigation, OMC did not raise the instant claim of a lease requirement for solid mineral extraction under 25 C.F.R. § 214.7. Relying on the res judicata doctrine, Osage Wind now seeks to preclude OMC from appealing the judgment below on the theory that OMC *could have* asserted the instant claim in the earlier litigation. See Wilkes v. Wyoming Dep't of Emp't Div. of Labor Standards, 314 F.3d 501, 503-04 (10th Cir. 2002) ("Under res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been raised* in the prior action." (emphasis in original) (quoting Satsky v. Paramount Comm., Inc., 7 F.3d

13

1464, 1467-68 (10th Cir. 1993))). Because Osage Wind has the burden of proving its affirmative defense of claim preclusion, Nwosun v. Gen. Mills Rest., 124 F.3d 1255, 1257 (10th Cir. 1997), we will not bar OMC from asserting the instant claim unless Osage Wind can show that the claim reasonably could have been raised in the prior lawsuit. We hold that Osage Wind has not met its burden.

Osage Wind does not explain how the instant claim would have been *ripe* for adjudication in 2011, almost three years before turbine excavation work began. At that early stage, the magnitude of the planned excavation work was not known to OMC or the United States, so it was not apparent that Osage Wind's proposed wind farm would violate 25 C.F.R. § 214.7. More to the point, if OMC had sought relief under § 214.7 in the prior lawsuit, Osage Wind might have rejoined that it had ample time to secure the approved lease, rendering the claim unripe for judicial review.

This is a plausible basis to defeat the application of res judicata, yet Osage Wind offers no response.[5] We cannot say that Osage Wind has carried its burden to prove claim preclusion when it offers no counterargument to OMC's ripeness theory, which we find facially plausible. Accordingly, res judicata does not apply to OMC's instant claim, and we proceed to the merits.[6]

---

[5] Osage Wind was on notice of this ripeness argument because the United States made the exact same argument before the district court.

[6] Osage Wind also invites us to affirm on the ground that OMC's instant claim is barred by the laches doctrine—which gives courts discretion to reject stale claims brought after unreasonable delay. See Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324, 1337 (10th Cir. 1982) (explaining that the laches doctrine is "vigorously enforced in cases involving mineral properties"). We decline to dispose of the case

14

## C. **Whether Osage Wind's Excavation Work Constituted Mining**

Osage Wind engaged in large-scale mineral excavation work to install wind turbines. It first removed rock sediment and soil from the ground, creating large holes into which it could pour a cement foundation for each turbine. Next, it sorted the extracted rock material into small and large pieces, and then crushed the smaller pieces so they would be the proper size for backfilling the holes. Finally, it positioned the bigger rock pieces adjacent to the backfilled excavation sites. All of this was done to add structural support to the large wind turbines installed deep in the ground. The question here is whether this excavation work—digging, sorting, crushing, and backfilling—constitutes "mining" under 25 C.F.R § 211.3.

### 1. *Administrative Deference to Agency Materials*

We first explain that our analysis does not depend on administrative deference to agency materials. The BIA (an agency within DOI) has recently taken the informal position in one instance that a so-called "Sandy Soil Lease" is required for roadwork that disrupts the mineral estate. Further, the Bureau of Land Management (BLM) (also within DOI) has suggested that large-scale excavations require authorization by permit or contract. See Mineral Materials Disposal; Sales; Free Use, 66 Fed. Reg. 58892, 58894 (Nov. 23, 2001); see also Bureau of Land Management,

---

on the equitable doctrine of laches. The United States commenced this action within three months after turbine excavation work began, which is not an unreasonable amount of time to wait before filing suit.

15

Unauthorized Use of Mineral Materials on Split Estate Lands, Instruction

Memorandum No. 2014-085 (Apr. 23, 2014), available at

https://www.blm.gov/policy/im-2014-085. We address these in turn.

Consider first the Sandy Soil Lease. The record reveals a single instance

where a contractor for Oklahoma Department of Transportation (ODOT) requested

and received a Sandy Soil Lease before building a highway through Osage County—

an endeavor that involved digging and backfilling incident to surface construction

work. Even if this evidence demonstrated a DOI policy of *requiring* such a lease

(rather than ODOT voluntarily seeking one out),[7] this kind of informal agency

position warrants deference only to the extent that it is thoroughly considered and

well-reasoned, or otherwise manifests certain qualities that gives it the "power to

persuade[.]" Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); accord Young v.

United Parcel Serv., Inc., 135 S. Ct. 1338, 1351-52 (2015). But the record here does

not show any context behind the adoption of the Sandy Soil Lease requirement.

OMC points to no agency interpretation, informal guidance document, adjudicatory

decision, or anything else that explains or even mentions the Sandy Soil Lease other

than negotiation letters involving ODOT's contractor, and the lease document itself.

Thus, we cannot say that DOI's Sandy Soil Lease requirement for mere surface

construction has the power to persuade.

---

[7] The district court found that the Sandy Soil Lease negotiations did not show a BIA policy that such a lease was required, instead the negotiations merely demonstrated an instance where a road contractor voluntarily agreed to pay for excavation of roadway materials.

16

OMC also directs us to BLM guidance materials that require a mineral lease for large-scale excavation work. In a preamble to the final rule adopting 43 C.F.R. § 3601.71—a separate and unrelated regulation to the one at issue in this case—the BLM explained that "a contract or permit" is required when a surface-estate owner engages in more than "minimal personal use of federally reserved mineral materials . . . ." 66 Fed. Reg. at 58894. Further, an internal BLM instruction memorandum, published in April 2014, explains:

> Any separation or alteration of the various constituents of the material, through methods such as screening or crushing, constitutes a mineral use of the materials and requires a contract or permit. Furthermore, any use of the materials in a construction project, such as . . . building foundations . . . also constitutes a mineral use of the materials—even if the material was not altered in any way—and also requires a contract or permit.

Bureau of Land Management, supra. OMC relies on these guidance documents to inform its interpretation of "mining" in 25 C.F.R. § 211.3 and the lease requirement in § 214.7.

We do not defer to these BLM documents because they explain the effect of a *separate* regulation, 43 C.F.R. § 3601.71.[8] That regulation—promulgated and administered by BLM, a separate bureau within DOI—governs mineral extraction activities on "public lands," which is expressly defined to *exclude* "lands held for the

---

[8] This regulation defines "unauthorized use" of minerals on public lands: "[Y]ou must not extract, sever, or remove mineral materials from public lands under the jurisdiction of the Department of the Interior, unless BLM or another Federal agency with jurisdiction authorizes the removal by sale or permit. Violation of this prohibition constitutes unauthorized use." 43 C.F.R § 3601.71(a).

benefit of Indians[.]"  Id. § 3601.5 (definition of "public lands" as that term appears

in 43 C.F.R. pt. 3600).  Therefore, the BLM could not have been exercising delegated

interpretive authority with respect to the Osage lands at issue here.  Thus, we give

these BLM materials no authoritative status in our analysis of the BIA's regulations.

Instead, we analyze the regulatory text at issue here by its own terms.


### 2.  *Textual Analysis of § 211.3*

"Mining means the science, technique, and business of *mineral development*,

including, but not limited to: opencast work, underground work, and in-situ leaching

directed to severance and treatment of minerals[.]"  25 C.F.R § 211.3 (emphasis

added).  After this threshold definition, the regulation then offers a caveat known as

the de minimis exception for common-variety minerals: "Provided, when [common

minerals] [are] the subject mineral, an enterprise is considered 'mining' only if the

extraction of such a mineral exceeds 5,000 cubic yards in any given year."  Id.

At the outset, the significance of the de minimis exception must be clarified.

OMC contends that this proviso establishes a separate definition specifically for

common-variety minerals—any extraction of such minerals exceeding 5,000 cubic

yards constitutes mining, *regardless* of whether the activity can be classified as "the

science, technique, [or] business of mineral development."  Id.   But that

interpretation is plainly wrong.  The inclusion of the de minimis exception does not

negate the need initially to satisfy the threshold definition of mining.  Rather, it

exempts from the definition of mining lower-volume extractions of common-variety

18

minerals. OMC's contrary reading contorts the plain language of the regulation, so we reject it.[9]

With that understanding we turn to the district court's interpretation of the regulation. The district court held that the definition of mining *necessarily* involves the commercialization of mineral materials, i.e., the sale of minerals. While the definition of mining certainly *includes* commercial mineral extractions and even offsite relocation of minerals, the district court's limitation of "mineral development" to those contexts is overly restrictive. The text of § 211.3 does not indicate that mining is confined to commercializing extracted minerals or relocating them offsite—instead it refers merely to the "science, technique, and business of mineral development." § 211.3. Finding no support in the § 211.3's text itself, Osage Wind attempts to buttress its preferred narrowing construction by reference to other provisions that contemplate the sale of minerals. We are not persuaded.

Osage Wind first points to 25 C.F.R. § 214.10, which governs royalty rates on Osage mineral leases. That rule provides that, for certain minerals, "the lessee shall

---

[9] The parties agree that the extracted rock here was of a common, nonprecious variety potentially subject to the de mimimis exception. When measured by the *aggregate* amount of rock removed from all eighty-four holes, there is no dispute that the total volume exceeded 5,000 cubic yards, which would make the de minimis exception inapplicable here. Osage Wind argues that the relevant amount of extracted minerals should be the amount removed from *each individual* hole. Measured on that individual basis, the volume of removed rock is less than the 5,000-cubic-yard threshold. However, this was a single integrated project unified by proximity of time, space, and purpose. Accordingly, we look to the total amount of minerals extracted, and hold that the de minimus exception does not apply.

pay quarterly a royalty of 10 percent of the value at the nearest shipping point of all ores, metals, or *minerals marketed*." Id. § 214.10(d) (emphasis added). But this royalty clause does not purport to limit the definition of "mining" in § 211.3 to an operation that produces minerals destined for the market, rather it merely provides that "marketed" minerals are subject to a 10-percent royalty.

Osage Wind also relies on the Osage Act itself to support this proposed commercialization requirement. The Osage Act permits owners of allotted surface lands to sell their properties, but expressly excluded "the *sale* of the oil, gas, coal, or other minerals" because the mineral estate was reserved to the Osage Nation. Osage Act, § 2 (emphasis added). But this does not mean that "mining" only occurs when the extracted minerals are being *sold*. Rather it means simply that surface estate owners cannot sell what does not belong to them, i.e., the mineral estate. We therefore do not see how the Osage Act supports the view that the minerals *must* be sold or marketed in order to trigger the defining of "mining" under 25 C.F.R. § 211.3.

To be sure, although we hold that § 211.3's mining definition is not limited to commercial extraction of minerals, we leave undisturbed the well-settled notion that mining *includes* the removal of minerals to make commercial use of them or to relocate them offsite. To hold otherwise would collide with the traditional and commonly shared understanding of mining. But more to the point, the phrase "mineral development" in § 211.3 undoubtedly encompasses traditional mining activities. In the context of natural resources, the term *develop* can mean "to make actually available or usable (something previously only potentially available or

20

usable)" such as "[develop]ing the natural resources of the region[.]" Webster's Third New Int'l Dictionary 618 (1986). Thus, commercial extractions or offsite relocations of minerals are included within § 211.3's ambit.[10]

But that is not what Osage Wind did here. Osage Wind did not remove minerals and then transport them offsite or otherwise commercialize the minerals themselves. Instead, Osage Wind sorted and then crushed the minerals and used them as backfill to support its wind turbine structures. The question is whether these excavation activities can be characterized as "mineral development" under § 211.3.

In analyzing this issue, we are cognizant of the long-established principle that ambiguity in laws designed to favor the Indians ought "to be liberally construed" in the Indians' favor. See, e.g., Millsap v. Andrus, 717 F.2d 1326, 1329 (10th Cir. 1983) (citing Alaska Pac. Fisheries v. United States, 238 U.S. 78, 89 (1918)). Without question, the regulations at issue here are designed to protect Indian mineral resources and "maximize [Indians]' best economic interests." 25 C.F.R. § 211.1 (purpose and scope of 25 C.F.R. pt. 211). Thus, to the extent there is doubt concerning § 211.3's scope, we adopt the interpretation that favors the Osage Nation.

---

[10] The former U.S. Bureau of Mines published a dictionary of mining terminology that confirms this observation, defining mining as follows: "The science, technique, and business of mineral discovery and exploitation. Strictly, the word connotes underground work directed to severance and treatment of ore or associated rock. Practically, it includes opencast work, quarrying, alluvial dredging, and combined operations, including surface and underground attack and ore treatment." Paul W. Thrush, Bureau of Mines, U.S. Dep't of Interior, A Dictionary of Mining, Mineral, and Related Terms (Dictionary of Mining) 715 (1968), available at http://files.eric.ed.gov/fulltext/ED059035.pdf.

With that in mind, we look to the text of § 211.3 which defines mining as "the science, technique, and business of *mineral development*[.]" Id. (emphasis added). By its plain terms, this definition contemplates an activity that is aimed at *developing* minerals. But neither the regulation nor the Osage Act clarify the outer limits of what it means to "develop" minerals in this context.

The list of examples in § 211.3 offers some interpretive assistance. Section 211.3 provides that mining "includ[es] but [is] not limited to: opencast work, underground work, and in-situ leaching *directed to severance and treatment of minerals*[.]" (emphasis added). The phrase "directed to severance and treatment of minerals" is best construed to qualify all elements in the list—opencast work, underground work, and in-situ leaching. Antonin Scalia & Bryan A. Garner, Reading Law: Interpretation of Legal Texts 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series.").[11] Therefore, each item in the

_____

[11] In other circumstances, a post-series modifier might be better understood to qualify only the last element in a list, known as the "nearest reasonable referent." Scalia & Garner, supra, at 152; see also Lockhart v. United States, 136 S. Ct. 958, 963 (2016) (applying a qualifying clause at the end of a series only to the "last antecedent" in the series). But context does not support that interpretation here. See Barnhart v. Thomas, 540 U.S. 20, 26 (2003) (acknowledging that "other indicia of meaning" can defeat the application of the last antecedent rule). In this case, applying "directed to severance and treatment of minerals" only to the last element in the series—in-situ leaching—would likely be redundant. The former U.S. Bureau of Mines has indicated that "in-situ leaching" already involves the severance and treatment of minerals. Dictionary of Mining 581 (defining "in-situ" as "in the natural or original position"); id. at 630 (defining "leaching" as the dissolving of soluble minerals out of the ore by exposing the rock to chemicals, acids, or water). To avoid this surplusage,

22

list involves an activity that is "directed to severance and treatment of minerals," which means that each example of "mineral development" involves some action upon the minerals to take advantage of them for some purpose. Because it is natural to construe a definition in light of its examples, this suggests at the very least that "mineral development" includes, but is not limited to, *action upon the minerals in order to exploit the minerals themselves*.

It might be reasonable to adopt the construction favored by Osage Wind, which sets as the definitional boundary the commercialization of the minerals. But because the phrase "mineral development" is ambiguous in this regulation, the Indian canon of interpretation tilts our hand toward a construction more favorable to Osage Nation, so we adopt the broader definition of "mineral development" when construing § 211.3: "mineral development" includes acting upon the minerals to exploit the minerals themselves.

We agree with Osage Wind, however, that merely encountering or incidentally disrupting mineral materials would not trigger § 211.3's definition. In other words, "the simple removal of dirt does not constitute mining." 53A Am. Jur. 2d Mines and Minerals § 14. There is simply no sense in which the word "mineral development" means only the removal of dirt without some further manipulation, commercialization, or offsite relocation of it. The problem here is that Osage Wind did not merely dig holes in the ground—it went further. It *sorted* the rocks, *crushed*

---

it makes more sense to apply the phrase "directed to the severance and treatment of minerals" to each element in the series.

23

the rocks into smaller pieces, and then *exploited* the crushed rocks as structural support for each wind turbine.  The ultimate question is whether this operation constitutes "mineral development" as we have conceptualized the term.  We hold that it does.

### 3. *Sorting and Crushing for Backfill Constitutes "Mineral Development"*

After Osage Wind removed the rock materials from each hole, it acted upon the minerals by altering their natural size and shape in order to take advantage of them for a structural purpose.  Osage Wind needed to stabilize these tall wind turbines, and "develop[ed]" the removed rock in such a way that would accomplish that goal.  This constitutes "mining" as defined by § 211.3.

To be sure, the sorting and crushing of rocks to provide structural support does not fit nicely with traditional notions of "mining" as that term is commonly understood.  Indeed, surface construction for a wind farm is a far cry from a typical mining operation, complete with canaries and sink shafts.  But as we discussed, the text of § 211.3 refers to "mineral development," which is not cabined or confined by the regulation or statute itself.  Because there is ambiguity in the scope of "mineral development" and the extent to which that phrase includes the sorting and crushing of minerals for the purpose of backfilling and stabilization, we adopt the interpretation that favors the Osage Nation.  Accordingly, Osage Wind's excavation work here constituted "mining" under § 211.3, thereby requiring Osage Wind to secure a

24

federally approved lease from OMC under § 214.7. Summary judgment for Osage Wind was therefore improper.

### 4. *This Result Does Not Conflict with Osage Act*

Osage Wind argues this result contradicts the Osage Act itself. We disagree. It is true that the Osage Act provides that surface lands overlying the mineral estate should be freely usable for activities such as "farming, grazing, or any other purpose not otherwise" prohibited by the Act. Osage Act, § 7. It goes further to say that surface fee owners "shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States[.]" Id. § 2. But our interpretation does not conflict with these provisions.

The expansive authority granted to surface-estate owners to use and develop their land is necessarily limited by the Act's reservation of the mineral estate to the Osage Nation, which itself has the right to demand a lease for certain uses of its minerals. Admittedly, surface construction activities may often implicate and disrupt the mineral estate—building a basement or swimming pool necessarily involves digging a hole in the ground, displacing rock and soil in the process. But as we have held, merely encountering or disrupting the mineral estate does not trigger the definition of "mining" under 25 C.F.R. § 211.3. If the minerals are not being shipped offsite or commercialized, then they must be acted upon for the purpose of exploiting the minerals themselves.

25

Moreover, to the extent there is a conflict between free use of the surface estate and exploitation of the mineral estate, the BIA has implemented a reasonable solution to that problem. As explained earlier, under § 211.3, any use of common-variety minerals that is less than 5,000 cubic yards will not trigger the OMC's right to demand a lease because the BIA has exempted such activities from the definition of mining. Id. Thus, in practice, owners of the surface estate retain virtually uninhibited use of their lands, unless of course they seek to *develop* more than 5,000 cubic yards of common-variety minerals. But in that scenario, the BIA has reasonably concluded that *development* of such minerals goes beyond mere use of the surface estate and implicates the mineral estate reserved to the Osage Nation.

Thus, our interpretation does not impermissibly conflict with the Osage Act's references to free use of the surface estate.[12]

## III.    CONCLUSION

Our dispositions of these consolidated appeals are as follows. First, because OMC is an appropriate party to the merits appeal, thereby making it unnecessary to decide whether it properly intervened below, we DISMISS as moot OMC's appeal from the denial of intervention, Appeal No. 16-5022. Second, because Osage Wind was required to procure a lease under 25 C.F.R. § 214.7, we REVERSE the district court's order

---

[12] Osage Wind, LLC's Motion to Dismiss Appeal for Lack of Jurisdiction and Osage Minerals Council's Motion to Strike Osage Wind's Supplemental Authority are denied.

26

granting summary judgment, Appeal No. 15-5121, and REMAND for further proceedings consistent with this opinion.