**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 10, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

CANYON FUEL COMPANY, LLC,

     Petitioner,

v.

SECRETARY OF LABOR; FEDERAL
MINE SAFETY AND HEALTH REVIEW
COMMISSION,

     Respondents.

No. 17-9541

_____

**Petition for Review of an Order from the**
**Federal Mine Safety and Health Review Commission**
**(MSHR No. West 2015-635)**

_____

Ralph Henry Moore, II (Patrick W. Dennison with him on the briefs), Jackson Kelly
PLLC, Pittsburgh, Pennsylvania, for Petitioner.

Emily C. Toler, Attorney (Nicholas C. Geale, Acting Solicitor of Labor; April E. Nelson,
Associate Solicitor; and Ali A. Beydoun, Counsel, Appellate Litigation, with her on the
brief), United States Department of Labor, Office of the Solicitor, Arlington, Virginia, for
Respondents.

_____

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

Canyon Fuel operates the Sufco Mine, a coal mine located in Sevier County, Utah. Under federal law, the mine must have two escapeways in the event of an emergency: a primary escapeway and an alternate escapeway. An inspector for the Mine Safety and Health Administration ("MSHA") cited Canyon Fuel for a violation of this mine safety requirement. Canyon Fuel unsuccessfully contested the citation before the federal agency and now petitions for judicial review of that decision. We affirm the Secretary of Labor's interpretation of the regulation as requiring consideration of both above- and below-ground factors, but we vacate the citation because it is not supported by substantial evidence.

## I. BACKGROUND

### A. *Factual History*

Canyon Fuel's Sufco Mine employs between eighty and ninety miners per shift. *Canyon Fuel Co. v. Sec'y of Labor, Mine Safety & Health Admin.*, 38 FMSHRC 2205, 2206 (2016) ("*Canyon Fuel I*"). Approximately twenty of those miners are deployed to the two working sections of the mine relevant to this appeal. *Id.* The primary escapeway from the mine exits through the West Lease Portal, which is the main entrance to the mine and is accessible by road. *Id.* at 2207. Canyon Fuel installed the 4 East Fan Portal in 1991 and designated it as the primary escapeway in 1992. *Id.* at 2210. Later, Canyon Fuel designated the 4 East Fan Portal as the alternate escapeway. *Id.* at 2210. The 4 East Fan Portal, unlike the West Lease Portal, opens onto a canyon ledge that is not accessible by road. *Id.* at 2207. For over twenty

years, the 4 East Fan Portal remained as Canyon Fuel's designated alternate escapeway, without objection from MSHA. *Id.* at 2214.

In June 2014, Russell Riley, MSHA's District Manager for Coal District 9, which includes the Sufco Mine, visited the mine to conduct an inspection. *Id.* at 2206. Mr. Riley examined the escapeway map and noted that the primary escapeway exited through the West Lease Portal, while the alternate escapeway exited through the 4 East Fan Portal. *Id.* at 2207. Mr. Riley asked why other portals close to the working sections were not used for escapeways and was told there were no roads to those portals. *Id.* Upon further inquiry, Mr. Riley learned that the 4 East Fan Portal also lacked road access. *Id.* Mr. Riley expressed his concerns about use of the 4 East Fan Portal as the alternate escapeway and, after considering several potential alternatives, suggested that Canyon Fuel instead designate as the alternate escapeway another route that paralleled the primary escapeway and also exited from the West Lease Portal (the "West Lease Portal escapeway"). *Id.* at 2208. The 4 East Fan Portal escapeway and the West Lease Portal escapeway travel along the same path for the first part of the route. The two escapeways then diverge and have significant differences which are relevant to this dispute. We now describe those differences in some detail.

**1. The 4 East Fan Portal Escapeway**

The current alternate escapeway for the Sufco Mine is the 4 East Fan Portal route. *Id.* at 2207. The distance from the 4 East Fan Portal to the deepest point of penetration in the working sections of the mine is 2.34 miles. *Id.* at 2212. The

3

escapeway from that deepest point to the 4 East Fan Portal has five overcasts, which are "ventilation control[s] that permit[] two air currents to cross without mixing." Appellant's Br. at 8. The existence of an overcast is important for assessment of the feasibility of an escapeway because the overcast creates "an overpass over an entry and must be climbed up and over to continue" along the escapeway. *Id.* Miners typically use either a ramp or a staircase to cross overcasts and, therefore, escaping miners usually cannot drive over an overcast in a vehicle. As a result, the more overcasts in an escapeway, the more difficult the path out of the mine. Such travel is further complicated if the miners are carrying an injured colleague.

The escapeway to the 4 East Fan Portal also requires two Self Contained Self Rescuer ("SCSR") change-out stations. An SCSR is a breathing apparatus designed to allow a miner to breathe clean oxygen in the event that the surrounding atmosphere is oxygen-deficient (potentially due to a fire) or contains harmful gases (such as methane). SCSRs are intended to last one hour, depending on the degree of physical exertion by the user of the SCSR and the user's physical condition. When a miner exhausts an SCSR, the miner replaces the empty SCSR with a new one, either one being carried by the miner or one that is stored in a change-out station along the route. SCSR change-out requirements are based on MSHA criteria. *See* 30 C.F.R. § 75.1714-4(c). A greater number of change-out stations generally corresponds with a longer travel time out of a mine or greater difficulty of travel.

Another significant aspect of the escapeway to the 4 East Fan Portal is that it is located in return air, rather than intake air. Air that comes into the mine immediately

4

prior to reaching the working sections is known as "intake air." After air has been used in the working sections, the air is known as "return air" and is transported out of the mine. Because intake air comes from outside the mine, it may not be contaminated with smoke or gases in a mine emergency. Thus, miners may not need to don an SCSR in intake air, assuming the ventilation system is still working. *See Sec'y of Labor, Mine Safety & Health Admin. v. Canyon Fuel Co.*, 39 FMSHRC 1578, 1594 n.14 (2017) ("*Canyon Fuel II*") (reversing commissioners) (if the ventilation system is not functioning, miners may be "inundated in smoke" and "require supplemental air"). As a result, it may be advantageous to have an escapeway with intake air, rather than return air.

Once the miners successfully traverse the escapeway, they will arrive at the 4 East Fan Portal, which exits to the surface on a "ledge" or shelf in the side of a cliff. *Canyon Fuel I*, 38 FMSHRC at 2207. The ledge is approximately 200 feet long by 50 feet wide and is located about 150 feet above the canyon floor. Several buildings on the ledge, including a storage shed, a backup generator, and the 4 East Fan/Fan House, occupy approximately half the area. The fan and the motor are inside the fan house, along with first aid and communication equipment. *Id.* at 2211. It is warm inside the fan house year round, if the fan is running. *Id.* The buildings include enough space, even in just the fan house, to fit all twenty miners who might need to use the escapeway. *Id.*

There is no road to the 4 East Fan Portal. *Id.* at 2207, 2211. As a result, miners seeking medical assistance would need either to walk down a "gradual" slope to an

5

unpaved cattle trail that parallels the dry creek bed at the bottom of the canyon or to climb to the top of the canyon. *Id.* at 2211. Both options would prove difficult. The cattle trail from the bottom of the 4 East Fan Portal shelf to a gravel road is approximately four to five miles long, is only two feet wide, and would take approximately two hours to walk, if clear. *Id.* In winter, the trail may have eight to twelve inches of snowpack. *Id.* Alternatively, miners exiting through the 4 East Fan Portal could climb to the plateau. That option would entail "travel[ing] 400 to 500 yards up a drainage area to get to the top." *Id.* Once on top of the plateau, a Forest Service road is located nearby. *Id.* But the road is not plowed during the winter, so there is no guarantee of medical assistance even if the miners made it to the top. *Id.* Canyon Fuel has not attempted its proposed route to the top of the plateau, yet claims it would be difficult, but possible, to carry an injured miner on a stretcher to the top. *Id.*

Helicopter service to the 4 East Fan Portal is restricted. *Id.* at 2212. Although the shelf is not large enough to land a helicopter, it may be possible to lower a basket for aerial evacuation of the miners in the event of an emergency. *Id.* at 2209. But Intermountain Life Flight, the only provider Canyon Fuel identified, has imposed significant restrictions on such flights. *Id.* at 2209, 2212. The "helicopters cannot fly in winds greater than 45 mph [or] with less than three miles of visibility." *Id.* at 2209. Furthermore, the helicopters do not fly at night, in rain, ice, sleet, fog, snow, or heavy cloud cover. *Id.* Thus, injured miners could remain stranded on the shelf until the morning or until the weather improved.

6

**2. The West Lease Portal Escapeway**

The escapeway proposed by MSHA is the West Lease Portal route. *Id.* at 2208.

The distance from the deepest point of penetration to the West Lease Portal is 5.88

miles, over 3.5 miles longer than the 4 East Fan Portal escapeway. *Id.* at 2212.

However, miners could drive roughly two-thirds of the proposed route if Canyon

Fuel staged vehicles in the escapeway.[1] *Id.* at 2208. The West Lease Portal

escapeway has twelve overcasts and would require five SCSR change-out stations.

This route largely parallels the primary escapeway. *Id.* Unlike both the primary

escapeway and the 4 East Fan Portal escapeway, however, it includes "a number of

turns." *Id.* at 2210. The route also includes about one hundred seals used to close off

mined out areas,[2] which may increase the hazard to escaping miners. *Id.* at 2213.

With the exception of the first part of the route, the West Lease Portal

escapeway is in intake air,[3] making the risk of smoke inhalation during an emergency

---

[1] Staging vehicles means leaving vehicles in the mine at a designated point in the escapeway. From the point of divergence of the 4 East Fan Portal route and West Lease Portal route, miners would need to travel approximately thirty-five "crosscuts" by foot. Mine operators develop crosscuts to connect parallel entries into a coal seam and may use crosscuts as a proxy for location or distance. If Canyon Fuel staged vehicles at crosscut 176, miners could drive from there to crosscut 4. They would then need to walk a few more crosscuts to exit.

[2] Depending on the barometric pressure in the atmosphere, the seals may ingas, in which gas leaves the mine into the sealed off area, or outgas, in which gas leaves the sealed off area into the mine. While the Sufco Mine does not produce many harmful gases, the outgas may include a low level of oxygen, which may increase the risk to miners traveling the route.

[3] From the point of divergence of the two routes, the 4 East Fan Portal route and the West Lease Portal route are in return air for approximately thirty and eight

unlikely. *Id.* at 2209. It would take approximately three hours to exit the mine from the point of divergence from the 4 East Fan Portal escapeway by walking. *Id.* at 2212.[4] This time may be increased if a miner is injured, wearing an SCSR, or carrying another miner. *Id.* Additionally, the route may require refuge alternatives as miners may not be able to make it out of the mine due to the distance and difficulty. The West Lease Portal route ends at approximately the same location as the primary escapeway; it has road access and medical transportation could be waiting for injured miners. *Id.* at 2208.

The following map is based on Government Exhibits 2 and 16 and Canyon Fuel Exhibit 1B. It depicts the working sections of the mine at the top, the 4 East Fan Portal on the right, and the West Lease Portal at the bottom. *See* slip op. at *9.

---

crosscuts, respectively. The 4 East Fan Portal route is in actual return air while the West Lease Portal route is in designated return air, which is air that has not ventilated a working section but has only been marked by Canyon Fuel as returned. The West Lease Portal route continues for another 200 crosscuts in intake air. Thus, the additional distance in return air for the 4 East Fan Portal route may be relatively short in comparison with the West Lease Portal route.

[4] While two-thirds of the route are drivable, the government presented no evidence of how long evacuation would take when driving.



Working Sections

Exit

Exit

—— Primary Escapeway
▼ 4 East Fan Portal/West Lease Portal Shared
★ Point of Divergence
● 4 East Fan Portal Escapeway
■ West Lease Portal Escapeway

9

## B. *Procedural History*

In March 2015, when Canyon Fuel had not changed its alternate escapeway from the 4 East Fan Portal route to the West Lease Portal route, MSHA issued Citation No. 8483766 for a violation of 30 C.F.R. § 75.380(d)(5). That regulation requires that escapeways be "[l]ocated to follow the most direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners." 30 C.F.R. § 75.380(d)(5). The citation explained that Canyon Fuel was in violation of the regulation because the alternate escapeway was not accessible via a roadway for land-traveling vehicles. *Canyon Fuel I*, 38 FMSHRC at 2206. MSHA determined the violation was not of a significant and substantial nature, concluded Canyon Fuel was moderately negligent, and proposed a penalty of $425. *Id.* Later, MSHA amended the citation to change the deficient condition to not providing "a roadway for land-travelling vehicles to access [the] area from the surface or any dependable alternative evacuation methods," but it left in place the determination of negligence and the proposed penalty. Joint App. at 111.

Two months later, MSHA issued Canyon Fuel two additional citations. *Canyon Fuel I*, 38 FMSHRC at 2218, 2222. Canyon Fuel challenges one of these, Citation No. 8480766, in a separate proceeding.[5] That citation charges a violation of

---

[5] After filing its notice to contest the citations, but before a decision was issued, *see infra*, Canyon Fuel filed a petition for modification of 30 C.F.R. § 75.1713-1(b) pursuant to 30 U.S.C. § 811(c). *In re Canyon Fuel Co. v. Mine Safety & Health Admin.*, 2016-MSA-8 (ALJ May 23, 2017), *available at* https://www.oalj.dol.gov/Decisions/ALJ/MSA/2016/In_re_CANYON_FUEL_

10

30 C.F.R. § 75.1713-1(b), which requires Canyon Fuel to "make arrangements with an ambulance service, or otherwise provide, for 24-hour emergency transportation for any person injured at the mine."

Canyon Fuel contested all three citations before an administrative law judge ("ALJ"). The ALJ affirmed Citation No. 8483766 (the violation of § 75.380(d)(5), requiring the escapeway to be "[l]ocated to follow the most direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners"), vacated another citation, and modified Citation No. 8480766 (the violation of § 75.1713-1(b), requiring 24-hour emergency transportation). *Canyon Fuel I*, 38 FMSHRC at 2227. Canyon Fuel then filed a petition for discretionary review of Citation No. 8483766 and Citation No. 8480766 with the Federal Mine Safety and Health Review Commission ("the Commission"). The Commission unanimously

---

COMPANY__2016MSA00008_(MAY_23_2017)_113837_CADEC_SD.PDF. Under § 811(c):

> [T]he Secretary may modify the application of any mandatory safety standard . . . if the Secretary determines that an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard, or that the application of such standard to such mine will result in a diminution of safety to the miners in such mine.

Canyon Fuel proposed building a safehouse and a helipad at the 4 East Fan Portal shelf as a substitute for the "24-hour emergency transportation" requirement of 30 C.F.R. § 75.1713-1(b). *Id.* at 11–12. It also identified another helicopter operator, the Utah Department of Public Safety, that has fewer restrictions on flights than Intermountain Life Flight. *Id.* An administrative law judge ("ALJ") denied the petition, *id.* at 46, but the Assistant Secretary of Labor vacated and remanded to the ALJ "for additional factual determinations and reconsideration of legal determinations," *In re Canyon Fuel Co. v. Mine Safety & Health Admin.*, 2016-MSA-8 (Assistant Sec'y of Labor Nov. 21, 2017).

11

affirmed Citation No. 8480766 (the violation of § 75.1713-1(b), requiring 24-hour emergency transportation). *Canyon Fuel II*, 39 FMSHRC at 1581–83. But the panel could not agree on Citation No. 8483766, the violation at issue here. Two commissioners voted to affirm the violation ("affirming commissioners") and two commissioners voted to reverse the violation ("reversing commissioners"). *Id.* at 1579. As such, the ALJ's decision for Citation No. 8483766 stands as though affirmed. *See Sec'y of Labor, Mine Safety & Health Admin. v. Penn. Elec. Co.*, 12 FMSHRC 1562, 1563-65 (1990).

Canyon Fuel timely filed this Petition for Review, challenging only Citation No. 8483766.

## II. DISCUSSION

Because the Commission vote split two-to-two, the ALJ's opinion affirming the violation was left in place and we review the ALJ's opinion. *Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n*, 519 F.3d 1176, 1191 (10th Cir. 2008). In doing so, we review the ALJ's legal conclusions de novo and his factual findings under the substantial evidence standard. *Id.*; 30 U.S.C. § 816(a)(1). To establish a violation of 30 C.F.R. § 75.380(d)(5), MSHA must identify a route that more closely complies with the regulation than the currently designated route. *Sec'y of Labor, Mine Safety & Health Admin. v. S. Ohio Coal Co.*, 14 FMSHRC 1781, 1785 (1992) (discussing § 75.380(d)(5)'s predecessor).

Canyon Fuel claims the ALJ improperly considered conditions existing outside the mine in determining that designation of the 4 East Fan Portal as the alternate escapeway

12

violated regulation 75.380(d)(5). It further contends that even if the ALJ were permitted to consider the conditions affecting miners once they exited through the 4 East Fan Portal, any finding as to whether the West Lease Portal route, and not the 4 East Fan Portal route, was "the most direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners" is unsupported by the record evidence. 30 C.F.R. § 75.380(d)(5). The Secretary of Labor ("Secretary") disagrees, asserting that both underground and above-ground conditions are relevant to whether the mine opening is "suitable for the safe evacuation of miners." *Id.* And the Secretary argues that the ALJ's finding that the West Lease Portal route better meets the regulation is adequately supported by the record evidence.

We begin our analysis with the legal question: whether MSHA may consider conditions existing above ground in considering whether Canyon Fuel violated 30 C.F.R. § 75.380(d)(5). We then proceed to the factual question: whether substantial evidence supports the ALJ's finding that the West Lease Portal route more closely complies with the regulation than the 4 East Fan Portal route. We conclude that the regulation permits the Secretary to consider all of the facts and circumstances affecting the escapeway, including surface conditions facing miners upon exit from the mine. But we vacate the citation because the ALJ's factual finding that the West Lease Portal route better meets the requirement that the escapeway be the "most direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners" than does the 4 East Fan Portal route is not supported by substantial evidence.

13

**A.** *Interpretation of the Regulation*

In interpreting the regulation, "we apply the same rules we use to interpret statutes." *Mitchell v. Comm'r*, 775 F.3d 1243, 1249 (10th Cir. 2015). We examine the plain language of the regulation and give each word its ordinary and customary meaning. *Id.* Thus, in determining the plain meaning of a regulation, we do not consider the regulatory history or anything outside the text. If the language of the regulation is clear, we enforce the regulation in accordance with its plain meaning, giving no deference to a contrary interpretation by the Secretary. *Id.* On the other hand, where the regulation is ambiguous, "we defer to the [Secretary]'s reasonable interpretations, even those advanced in his legal brief, unless 'plainly erroneous or inconsistent with the regulations,' or there is any other 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" *Id.* (quoting *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208, 209 (2011)). In making this determination, we may "look beyond the plain language, examining regulatory intent and overall statutory construction." *Qwest Corp. v. Colo. Pub. Utils. Comm'n*, 656 F.3d 1093, 1099 (2011) (internal quotation marks omitted). Finally, "a regulation must be interpreted in such a way as to not conflict with the objective of its organic statute." *Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1050 (10th Cir. 2004).

**1. Plain Language**

Canyon Fuel and the Secretary each argue that the plain language of 30 C.F.R. § 75.380(d)(5) supports their interpretation of the regulation. Canyon Fuel argues the text

14

of the regulation "addresses the efficiency of the alternate escape routes out of the mine for purposes of providing miners . . . quick and safe egress out of the mine." Appellant's Br. at 15. It does not, according to Canyon Fuel, "consider conditions outside once evacuation of miners from underground has occurred." *Id.* In turn, the Secretary argues that § 75.380(d)(5) includes "two distinct requirements: (1) escapeways must be 'located to follow the most direct, safe and practical route to the nearest mine opening,' and (2) that mine opening must be 'suitable for the safe evacuation of miners.'" Appellee's Br. at 25–26 (quoting 30 C.F.R. § 75.380(d)(5)). According to the Secretary, "[w]hether a mine opening is 'suitable for the safe evacuation of miners' depends on whether, at that mine opening, miners are out of danger or can be quickly and safely removed from danger—an analysis that must take into account conditions both underground and at the surface." *Id.* at 26.

The regulation reads:

> (d) Each escapeway shall be—
> . . . .
> (5) Located to follow the most direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners . . . .

30 C.F.R. § 75.380(d)(5). The regulation does not define "evacuation" or "suitable"; thus we interpret them to have their ordinary or dictionary definitions. *See Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1227–28 (10th Cir. 2014). The definition of "evacuate" most relevant in this context is: "[t]o remove . . . to safer surroundings." *Evacuate*, Oxford English Dictionary, http://www.oed.com/view/Entry/65161 (last visited June 25, 2018). Thus, "evacuation" as used in the regulation

15

could mean either (1) removal from the interior of the mine to the mine opening or (2) removal from the mine opening to another location. In turn, "suitable" is defined as "fitted for, adapted or appropriate to a person's . . . needs . . . ." *Suitable*, Oxford English Dictionary, http://www.oed.com/view/Entry/193721 (last visited June 25, 2018). The definition of "suitable," like the definition of "evacuation," does not dictate that either the Secretary's or Canyon Fuel's reading is plainly correct.

a. *Does "suitable for the safe evacuation of miners" modify the "route" or the "mine opening"?*

The Secretary argues "suitable for the safe evacuation of miners" applies to the mine opening instead of the route. Contrarily, Canyon Fuel argues that "suitable for the safe evacuation of miners" modifies the route. In support of his position, the Secretary notes that principles of statutory construction, such as the "nearest reasonable referent canon" (sometimes called the last antecedent rule), support his reading. Under this canon, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); *United States v. Osage Wind, LLC*, 871 F.3d 1078, 1091 n.11 (10th Cir. 2017), *petition for cert. filed*, 17-1237 (Mar. 6, 2018). Because the phrase "suitable for the safe evacuation of miners" immediately follows "mine opening," the Secretary argues that the "grammatically sound interpretation" is that it modifies "mine opening" instead of "route." Appellee's Br. at 28.

But this canon of construction is not mandatory nor is it always the most reasonable interpretation of a regulation. Indeed, we have classified it as "merely an

16

interpretive presumption based on the grammatical rule against misplaced modifiers." *Payless Shoesource, Inc. v. Travelers Cos.*, 585 F.3d 1366, 1371 (10th Cir. 2009) (rejecting the application of the canon). And the Supreme Court has noted that the presumption "can assuredly be overcome by other indicia of meaning." *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 355 (2005) (internal quotation marks omitted). "Given how common misplaced modifiers are in daily usage, the Supreme Court has candidly acknowledged that 'over the years, such indicia have counseled us against invoking the rule (often unanimously) at least as many times as we have relied on it.'" *Payless*, 585 F.3d at 1371–72 (quoting *Jama*, 543 U.S. at 355). Thus, "while the rules of English grammar often afford a valuable starting point to understanding a speaker's meaning, they are violated so often by so many of us that they can hardly be safely relied upon as the end point of any analysis of . . . plain meaning." *Id.* at 1372. We have also noted that "referential and qualifying words or phrases refer only to the last antecedent, unless contrary to the apparent legislative intent." *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1038 (10th Cir. 2003) (internal quotation marks omitted). So, while the "nearest reasonable referent canon" provides one possible reading of the regulation, we are not bound by the grammatical principle, especially if it is contrary to the "apparent [regulatory] intent" of the regulation.

The Secretary further argues that Canyon Fuel's interpretation renders the phrase "suitable for the safe evacuation of miners" meaningless because other standards and the other clause of § 75.380(d)(5) already require the escapeway routes to be "suitable for the safe evacuation of miners." Because we should interpret the standard to give effect to

17

each word and clause, *see, e.g.*, *Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 927 F.2d 1150, 1153 (10th Cir. 1991), the phrase must be read to modify the mine opening rather than the route. The Secretary contends that Canyon Fuel's reading of the standard renders the phrase superfluous—if the route is the "most direct, safe and practical," then it would also be suitable for "safe evacuation." Thus, he argues, the phrase "suitable for the safe evacuation of miners" logically must modify the mine opening. But Canyon Fuel counters that "suitable for the safe evacuation of miners" clarifies that the shortest route may not be proper if conditions inside the mine render it unsuitable. We are convinced that both positions are reasonable.

The Secretary and Canyon Fuel each advance reasonable interpretations of the text. The phrase "suitable for the safe evacuation of miners" might be intended to modify either the route or the mine opening.

b.      *Are outside conditions considered in determining "suitability"?*

It is also not plain from the text of the regulation whether conditions outside the mine may be considered in determining "suitability." If, as Canyon Fuel argues, the route must be "suitable for the safe evacuation of miners" to the surface, it is reasonable to conclude that conditions inside the mine, rather than conditions at the surface, are considered in determining suitability. The Secretary disagrees and contends that, if the mine opening itself must be "suitable," then it is reasonable to include conditions outside the mine. Simply put, the language of the regulation standing alone does not clearly indicate whether conditions outside the mine may be considered.

18

Nor does looking to other regulations in the section resolve this ambiguity. To be sure, these subsections all deal with conditions inside the mine[6] and thus may suggest that (d)(5) also relates to conditions inside the mine. And subsection (e) of the escapeway standard, which specifically provides requirements for surface openings, is focused on surface conditions that may impact conditions in the mine.[7] But nothing in subsection 75.380(d)(5) precludes the analysis of suitability from including an examination of conditions on the surface affecting the miners' safety upon exiting the mine.

Further, as noted by the Secretary, without some consideration of outside conditions, the regulation could lead to an absurd result. For example, an escapeway could lead to a shelf with no shelter and no exit, a shelf that is only two feet wide, or a cliff with no shelf at all. The Secretary argues that under such circumstances, the

---

[6] 30 C.F.R. § 75.380(d) reads:

(d) Each escapeway shall be—
    (1) Maintained in a safe condition . . . ;
    (2) Clearly marked to show the route and direction of travel to the surface;
    (3) Maintained to at least a height of 5 feet from the mine floor to the mine roof . . . ;
    (4) Maintained at least 6 feet wide . . . ;
    (5) Located to follow the most direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners; and
    (6) Provided with ladders, stairways, ramps, or similar facilities where the escapeways cross over obstructions.
    (7) Provided with a continuous, durable directional lifeline or equivalent device that shall be—
        (i) Installed and maintained throughout the entire length of each escapeway . . . .

[7] "Surface openings shall be adequately protected to prevent surface fires, fumes, smoke, and flood water from entering the mine." 30 C.F.R. § 75.380(e).

escapeway would not lead to a "mine opening suitable for the safe evacuation of miners." It follows then, he continues, that any evaluation of the suitability of a mine opening must consider conditions both outside of the mine and underground.

* * *

Both Canyon Fuel and the Secretary have advanced plausible interpretations of the regulation's plain language. Thus, we agree with the ALJ that the regulation is ambiguous. *Canyon Fuel I*, 38 FMSHRC at 2214. "Suitable for the safe evacuation of miners" could modify either the "route" or the "mine opening." Additionally, whether conditions outside the mine may be considered in determining "suitability" for the safe evacuation of miners is not clear from the text of the regulation.

## 2. Deference to the Secretary

Because the plain language of the regulation is ambiguous, "we defer to the [Secretary]'s reasonable interpretations, even those advanced in his legal brief, unless 'plainly erroneous or inconsistent with the regulations,' or there is any other 'reason to suspect that the interpretation does not reflect the [Secretary]'s fair and considered judgment on the matter in question.'" *Mitchell*, 775 F.3d at 1249 (quoting *Chase Bank*, 562 U.S. at 208, 209). As discussed, the Secretary has interpreted the regulation to require the consideration of two factors: 1) whether the escapeway is "[l]ocated to follow the most direct, safe and practical route to the nearest mine opening;" (practicality) and 2) whether that "mine opening" is "suitable for the safe

20

evacuation of miners" (suitability).[8] 30 C.F.R. § 75.380(d)(5). The Secretary has also indicated that whether the mine opening is "suitable for the safe evacuation of miners" takes into consideration conditions both inside the mine and outside the mine.

Having already concluded that the Secretary's interpretation is not precluded by the plain language of the statute, we next consider whether deference to the Secretary is inappropriate because the Secretary's "current interpretation runs counter to the intent at the time of the regulation's promulgation," *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (internal quotation marks omitted). That intent may be determined, at least in part, based on "the regulation's history, the agency's contemporaneous explanation, and its consistently held interpretive views." *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 336 (2011); *see Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 794–95 (10th Cir. 2010) (determining whether "an alternative reading [other than that of the Secretary] is compelled . . . by other indications of the Secretary's intent at the time of the regulation's promulgation" by referencing the regulatory history including responses to public comments). In addition, "a regulation must be interpreted in such a way as to not conflict with the objective of its organic statute," *Time Warner*, 381 F.3d at 1050, so a reading contrary to the governing statute does not deserve deference. But "where there is an

[8] For clarity, we refer to the first factor as an assessment of the practicality of the route and the second factor as the suitability of the mine opening. When referring to the comprehensive consideration of both practicality of the route and suitability of the mine opening, we refer to the most acceptable escapeway—or acceptability.

interpretation of an ambiguous regulation which is reasonable and consistent with the statute, that interpretation is to be preferred." *Emery Mining Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1414 (10th Cir. 1984) (internal quotation marks omitted).

    a.    *History of the regulation*

In 1977, Congress passed the Federal Mine Safety and Health Act to improve safety and health in the nation's mines. 30 U.S.C. § 801(a). As part of the statute, Congress created MSHA to act on behalf of the Secretary of Labor to promulgate safety and health standards, inspect mines, issue citations, and propose penalties for violations. *Id.* §§ 811(a), 813(a), 814(a), 814(d), 815(a), 820(a). Congress also created the Commission to review the actions of MSHA. *Id.* § 823(a). ALJs hear contests of citations initiated by mine operators and conduct initial hearings, while the Commission has discretion to review the decisions of the ALJs. *Id.* § 823(d)(2)(A)(ii). Further review by a federal court of appeals is allowed as a matter of right. *Id.* § 816(a).

The predecessor to the 1977 Act, the Federal Coal Mine Health and Safety Act of 1969, required mine operators to maintain a primary and alternate escapeway, which must be separate and distinct. Pub. L. No. 91-173, § 317(f)(1), 83 Stat. 742, 788 (1969). Congress required two escapeways because, in an emergency, one escapeway may be inaccessible or untraversable. "Mine fires, extensive collapse of roof, or similar occurrences may completely block the regular travelway . . . thus cutting off escape in an emergency unless an alternate route is provided to the

surface." S. Rep. No. 91-411, at 83 (1969). This requirement was retained in the 1977 Act:

> [A]t least two separate and distinct travelable passageways . . . which are to be designated as escapeways . . . shall be provided from each working section . . . and shall be maintained in safe condition and properly marked. . . . Escape facilities approved by the Secretary . . . , properly maintained and frequently tested, shall be present at or in each escape shaft or slope to allow all persons, including disabled persons, to escape quickly to the surface in the event of an emergency.

30 U.S.C. § 877(f)(1).

In accordance with this section, the Bureau of Mines developed standards for escapeways and proposed rules addressing escapeways. 37 Fed. Reg. 26,422, 26,423–24 (Dec. 12, 1972). The Bureau noted that "[b]ecause escapeways should permit rapid exit from a mine in the event of an emergency, . . . the speed with which exit can be achieved will be increased if escapeways are located to follow the most direct route of travel to the nearest mine opening." *Id.* at 26,424. The Bureau thus *proposed* rule 75.1704-2(a), the predecessor to rule 75.380(d)(5), as "all travelable passageways designated as escapeways . . . shall be located to follow the most direct route of travel to the nearest mine opening." *Id.* But the rule *as enacted* included the additional clause at issue here: "all travelable passageways designated as escapeways . . . shall be located to follow . . . the safest direct practical route to the nearest mine opening *suitable for the safe evacuation of miners*." 38 Fed. Reg. 29,997, 30,000 (Oct. 31, 1973) (emphasis added). The Bureau noted that "[t]his change was made to emphasize that not only the most direct route but also the safest route must be considered in establishing escapeways." *Id.* at 29,998.

In 1988, MSHA proposed moving the rule to its current location and recommended changes to the rule. 53 Fed. Reg. 2382, 2407–09 (Jan. 27, 1988). The proposed rules included requirements for the marking, height, and width of escapeways. *Id.* at 2408. Regarding § 75.1704-2(a), MSHA stated that "[e]scapeways would be required to follow the most safe and direct practical route to the surface. Impractical routes would therefore not be required to be designated, even though they may be the shortest routes of travel." *Id.* As such, it proposed the rule that the escapeways be "[l]ocated to follow the most direct and safe practical route to the surface." *Id.* at 2422. The final rule required escapeways to be "[l]ocated to follow the most direct, safe and practical route to the surface." 57 Fed. Reg. 20,868, 20,926 (May 15, 1992).

During a later revision to the escapeways standards in 1996, MSHA noted confusion over "whether MSHA intended that the existing rule eliminate the requirement that escapeways be routed to the 'nearest mine opening.'" 61 Fed. Reg. 9764, 9812 (Mar. 11, 1996). MSHA commented that it was not its "intent to change [the] requirement from the previous standard. The existing requirement that the escapeway follow the most direct route to the surface would, in fact, require the route to go to the nearest mine opening." *Id.* "[T]o eliminate any confusion," it adopted language similar to the previous rule. *Id.* MSHA acknowledged that "the nearest mine opening may not always be the safest route to the surface" and different "factors affect whether or not the safest, most direct, practical route has been selected," such as "roof conditions, travel height, fan location, physical dimensions of the mine

opening, and similar considerations." *Id.* It then gave a variety of examples of situations in which the "nearest mine opening" may not be "suitable for safe evacuation of miners," such as roof falls, coal seam thickness, or old, deteriorated mine shafts. *Id.* at 9812–13. In response to a suggestion that MSHA require escapeway plans to be approved "to assure the most direct route to the surface," MSHA responded that "inspectors assess whether escapeways follow the most direct, safe and practical route to the surface during each regular inspection." *Id.* at 9813. MSHA further noted that "[t]he escapeway should be appropriately located and designed to be free of obstructions and hazards to assure safe passage from the hazardous underground environment." *Id.* at 9810. The rule was thus changed to its current form, mandating that escapeways be "[l]ocated to follow the most direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners." *Id.* at 9843; 30 C.F.R. § 75.380(d)(5).

      b.     *The parties' contentions regarding the regulatory history*

As noted above, in 1992, when MSHA rephrased the standard, it replaced "nearest mine opening suitable for the safe evacuation of miners" with "surface." 57 Fed. Reg. at 20,926. When it revised the standard again in 1996, it replaced "surface" with "nearest mine opening suitable for the safe evacuation of miners." 61 Fed. Reg. at 9843. The Secretary argues that "MSHA's consistent treatment of those words as a unit shows that the phrase 'suitable for the safe evacuation of miners' modifies the term 'mine opening.'" Appellee's Br. at 31. Further support for this argument, according to the Secretary, is found in the preamble to the 1996 rule which states

25

"there can be other instances where the 'nearest mine opening' may not be suitable for safe evacuation of miners." 61 Fed. Reg. at 9813. Even if "evacuation" were considered complete when a miner leaves the mine, the Secretary contends the regulation requires more; it requires "safe evacuation." If miners were "stranded on a ledge, forced to descend a canyon and hike for miles through the woods, or forced to scramble thousands of feet up a canyon wall," they have not yet completed a "'safe' evacuation." Appellee's Br. at 35. Thus, the Secretary argues, Canyon Fuel's interpretation, which ignores surface conditions, "improperly reads out of the standard the requirement that evacuations must be safe." *Id.*

Canyon Fuel reads the regulatory history differently. It notes that the preamble and examples related to suitability provided in the regulation each deal exclusively with conditions inside the mine. *See* 61 Fed. Reg. at 9810, 9812–13. For example, factors identified as relevant include "roof conditions, travel height, fan location, physical dimensions of the mine opening, and similar considerations." 61 Fed. Reg. at 9812. And the regulatory history further provides that "there can be other instances where the 'nearest mine opening' may not be suitable for safe evacuation of miners," such as "an old mine shaft" that is "not . . . safe for travel because of badly deteriorated conditions, such as a deteriorated shaft lining or deteriorated timbers." *Id.* at 9813. Because all of these examples address conditions existing in the mine, Canyon Fuel argues that only underground conditions are properly considered.

We are not convinced the Secretary's "current interpretation runs counter to the intent at the time of the regulation's promulgation." *Gonzales*, 546 U.S. at 258

26

(internal quotation marks omitted). Although it is true that much of the regulatory history refers to conditions inside the mine, those references are not exclusive. Nothing in the regulatory history prevents MSHA from considering the conditions facing the miners upon exit from the mine. And the Secretary's consideration of all conditions of the escapeways, both inside and outside the mine, is consistent with selecting the most acceptable escapeway—the one that best protects the health and safety of the miners. Thus, the Secretary's interpretation is consistent with the intent of the regulation.

c.     *Consistency with the statute*

Even if the Secretary's interpretation of the regulation is otherwise reasonable, we will not defer to it if that interpretation is in "conflict with the objective of its organic statute," *Time Warner*, 381 F.3d at 1050. "To test whether an agency's regulation conflicts with its governing statute, we employ the two-step analysis mandated by *Chevron*. At the first step, we utilize 'traditional tools of statutory construction' to ascertain whether 'Congress had an intention on the precise question at issue.'" *Contreras-Bocanegra v. Holder*, 678 F.3d 811, 816 (10th Cir. 2012) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)). "[T]he resolution of this threshold inquiry will be at least influenced, if not determined, by how broadly we frame the 'precise question.'" *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1222 (10th Cir. 2017) (quoting *Bank of Am., N.A. v. FDIC*, 244 F.3d 1309, 1316 (11th Cir. 2001)). "If Congress' intent is clear, 'that is the end of the matter.'" *Contreras-Bocanegra*, 678 F.3d at 816 (quoting *Chevron*,

27

467 U.S. at 842). Only if "the statute is silent or ambiguous with respect to the specific issue," do we proceed to the second *Chevron* step and determine whether the agency's interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

The Mine Act provision relevant here states: "Escape facilities approved by the Secretary or his authorized representative, properly maintained and frequently tested, shall be present at or in each escape shaft or slope to allow all persons, including disabled persons, to escape quickly to the surface in the event of an emergency." 30 U.S.C. § 877(f)(1). The "precise question at issue" is what determines whether an escapeway allows miners "to escape quickly to the surface," particularly whether it is appropriate to consider surface conditions at the exit. At step one, we conclude that Congress did not speak directly to this question; nothing in the statute speaks to whether conditions faced by the miners on the surface may be considered.

Under step two of the *Chevron* analysis, we turn to the Secretary's interpretation of the regulation, which states that "escap[ing] quickly to the surface" is accomplished through an escapeway that "follow[s] the most direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners." 30 C.F.R. § 75.380(d)(5). Recall that the Secretary reads the regulation as requiring the consideration of two factors in determining which escapeway is the most acceptable. First, the Secretary must assess whether the route is the "most direct, safe and practical route to the nearest mine opening." Second, the Secretary must determine whether the mine opening itself is "suitable for the safe evacuation of miners." And in assessing the

28

suitability of the mine opening, the Secretary deems it appropriate to consider conditions both at the surface and underground.

We hold that the Secretary's interpretation of the regulation is a permissible construction of the statute. It furthers the Mine Act's goal of protecting the health and safety of miners by considering all of the circumstances both above and below ground in determining whether an escapeway is the most acceptable. Thus, the regulation as interpreted by the Secretary does not conflict with the statute.

\* \* \*

Because the Secretary's interpretation of the regulation is reasonable, we defer to that interpretation. The regulation thus requires the selection of the most acceptable escapeway by considering: 1) whether the route is "[l]ocated to follow the most direct, safe and practical route to the nearest mine opening"; and 2) whether that "mine opening" is "suitable for the safe evacuation of miners," in light of conditions inside and outside the mine. 30 C.F.R. § 75.380(d)(5).[9] We now consider whether the ALJ properly concluded that Canyon Fuel violated the regulation by designating the 4 East Fan Portal as the alternate escapeway at its Sufco Mine.

---

[9] Canyon Fuel argues that the history of non-citation for the 4 East Fan Portal escapeway shows that the current interpretation is inconsistent with prior interpretations and thus undeserving of deference. However, the actions of the MSHA District Office do not represent the Secretary's interpretation of the regulation. *See United States v. Mead Corp.*, 533 U.S. 218, 233–34 (2001) (thousands of decisions made annually by an agency's "scattered" district offices do not have the force of law); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) ("But *Chevron* deference is owed to the decisionmaker authorized to speak on behalf of the agency, not to each individual agency employee."). Thus, the lack of citation for over twenty years does not establish inconsistency with prior interpretations.

29

## B. *Evidence of § 75.380(d)(5) Violation*

### 1. Substantial Evidence Standard

The ALJ's factual findings regarding the occurrence of a § 75.380(d)(5) violation are conclusive if they are supported by substantial evidence. *See* 30 U.S.C. § 816(a)(1) ("The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.").

> Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker. Substantial evidence requires more than a scintilla, but less than a preponderance. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. Thus, we may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.

*Plateau Mining Corp.*, 519 F.3d at 1194 (internal quotation marks omitted). "We neither reweigh the evidence nor substitute our judgment for that of the agency." *Andalex Res., Inc. v. Mine Safety & Health Admin.*, 792 F.3d 1252, 1257 (10th Cir. 2015) (internal quotation marks omitted). "[O]ur review is very deferential to the agency." *Id.* (internal quotation marks omitted).

To establish a violation of § 75.380(d)(5), however, "[i]t is insufficient for the Secretary to merely cite the designated route as being out of compliance with the regulation." *S. Ohio Coal*, 14 FMSHRC at 1785. Rather, "it is the Secretary's burden to prove that, as compared to the designated route, there is at least one other escapeway route that [he] has determined more closely complies with the standard's

30

requirement." *Id.* The Secretary must identify "a specific escapeway alternative that more fully complies with [the standard's] criteria than does the cited route." *Id.* Thus the question before us is whether substantial evidence shows that the West Lease Portal escapeway more closely complies with § 75.380(d)(5) than does the 4 East Fan Portal escapeway. This entails a comprehensive comparison of *both* factors identified in the regulation: which route is "[l]ocated to follow the most direct, safe and practical route to the nearest mine opening" and whether the mine openings are "suitable for the safe evacuation of miners." Only after consideration of the relative advantages and disadvantages of each escapeway as to both regulatory factors can the Secretary make a rational choice between them. That is, the Secretary must evaluate the relative acceptability of the proposed alternate escapeways by considering both the practicality of each route and the suitability of each mine opening.

Upon review of the record as a whole, we conclude the Secretary failed to engage in that comprehensive comparison and, therefore, substantial evidence does not support a finding that the West Lease Portal is the more acceptable alternate escapeway.

## 2. Application

According to the ALJ, "the Secretary established that Canyon Fuel's route [the 4 East Fan Portal route] was deficient." *Canyon Fuel I*, 38 FMSHRC at 2217. The ALJ further explained:

> The escapeway to the 4 East Fan Portal did not account for the fact that miners would be stranded there once they exited the mine. This fact would create a hazard to escaping miners particularly in cold or snowy

31

weather and more especially if any miners are seriously injured. The Secretary presented a specific escapeway alternative he believes provides for a safer, direct, practical route for escaping miners. The Secretary took into consideration a number of factors, including those discussed above. MSHA's proposed escapeway is drivable for most of its length and is mostly in a separate intake air course. This air course would not be affected by a fire in the working section or the belt. Although the alternative escapeway favored by the Secretary is longer than Canyon Fuel's, it is similar in length to the primary escapeway. [Ms.] Yeager traveled the Secretary's proposed route and testified that the overcasts are not difficult to negotiate, noting that there were well-built stairs. The Secretary acknowledges that if SCSRs are needed, miners will need to change them out more frequently using the West Lease Portal escape route. Finally, any escaping miners[,] who must remain at the 4 East Fan Portal for a period of time before they can be rescued, could be overcome by smoke and toxic fumes. The Secretary maintains that in considering all the factors set forth in the safety standard, his designated alternative escapeway is the safest direct practical route.

*Id.* at 2217–18 (citation omitted).

It is unclear from the ALJ's opinion whether he found the 4 East Fan Portal mine opening "[un]suitable for the safe evacuation of miners" or whether he found the opening suitable but also found the West Lease Portal escapeway more acceptable.[10] We need not resolve this issue because under either analysis, the decision is not supported by substantial evidence.

---

[10] The Secretary reads the ALJ's decision as finding the 4 East Fan Portal unsuitable both in his brief before the Commission and in his brief before us. And that is also the view taken by the affirming commissioners. *Sec'y of Labor, Mine Safety & Health Admin. v. Canyon Fuel Co.*, 39 FMSHRC 1578, 1588 n.11 (2017) ("*Canyon Fuel II*") (affirming commissioners) ("The termination point of this escapeway failed to provide for 'safe evacuation of miners,' as the standard requires, and thus was not 'suitable.'"). But the reversing commissioners did not view the ALJ's opinion in that manner. They rejected the "assert[ion] that the Secretary's representative did make a determination that the [4] East Fan Portal route was per se unsuitable because it would not safely evacuate the miners" and instead noted that

Even accepting that a mine opening must be at least minimally "suitable for the safe evacuation of miners" before it can be considered as part of an acceptable alternate escapeway, the record evidence must allow for such a conclusion. For example, if an escapeway plunges to the canyon floor or leads to a shelf so small that it cannot accommodate all of the escaping miners, the Secretary may not be required to look beyond the mine opening's unsuitability to prove a violation of § 75.380(d)(5).[11] But such situations are rare and in the vast majority of cases, the Secretary must make a comprehensive comparison of both the practicality of the routes and the suitability of the mine openings to determine that one escapeway is more acceptable than another. As previously discussed, the text and history of the escapeways statute and regulations are focused on underground conditions, including with respect to the suitability of mine openings. *See supra* Sections II.A.1.b, II.A.2.a. Although we have concluded this focus does not preclude the Secretary from also considering above-ground conditions, not even the Secretary suggests that he can consider such above-ground conditions to the exclusion of underground conditions. Instead, the Secretary has argued that "[w]hether a mine opening is 'suitable for the safe evacuation of miners'" is "an analysis that *must take into account conditions both underground and at the surface*." Appellee's Br. at 26 (emphasis added). And the Secretary acts arbitrarily if he "entirely fail[s] to consider an important

___

this was "not a case of self-evident unsuitability." *Id.* at 1593 & n.12 (reversing commissioners).

[11] Even where a cited alternate escapeway does not lead to a suitable mine opening, it is possible that the proposed alternate escapeway is also deficient either due to a similarly unsuitable mine opening or due to a completely impractical route.

aspect of the problem." *Ariz. Pub. Serv. Co. v. U.S. E.P.A.*, 562 F.3d 1116, 1123 (10th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). That is what happened here.

Considering only above-ground conditions can also lead to absurd results. Suppose that, instead of the hospital being located fifty miles from the West Lease Portal, it is located fifty feet away. This would make the surface conditions at the West Lease Portal quite beneficial, especially compared to the 4 East Fan Portal. But also suppose the underground escapeway leading to the West Lease Portal is one hundred miles long instead of six miles long and includes numerous overcasts or heightened risk of contaminated air. The Secretary's piecemeal consideration of only above-ground conditions at the mine openings leads to the conclusion that the West Lease Portal is "suitable" while the 4 East Fan Portal remains "unsuitable," despite the significant potential hazards posed by a much longer underground trek. The Secretary must perform a holistic analysis and consider both the underground and the surface conditions at the West Lease Portal and its route *and* compare those conditions with the corresponding surface and underground conditions of the 4 East Fan Portal and its route to properly determine which escapeway is most acceptable because it is located to follow "the *most* direct, safe and practical route to the nearest mine opening suitable for the safe evacuation of miners," 30 C.F.R. § 75.380(d)(5) (emphasis added).

Here, there is not substantial evidence to support a finding that the 4 East Fan Portal is per se "[un]suitable for the safe evacuation of miners." As the Secretary

34

admits, suitability of the mine opening "depends on conditions *both* underground *and* at the surface." Appellee's Br. at 24 (emphasis added). To be sure, the surface conditions at the 4 East Fan Portal are *not* ideal—potentially leaving injured miners stranded inside the fan house for some indeterminate period until the weather permits helicopter evacuation or forcing them to make challenging ascents or descents, possibly through a foot or more of snow, to seek medical assistance that is still miles away. This evidence may show the 4 East Fan Portal is *less* suitable than the West Lease Portal; however, it does not show that the 4 East Fan Portal is *unsuitable*. Miners may be stranded on the shelf awaiting rescue from a helicopter, *Canyon Fuel I*, 38 FMSHRC at 2217, but there are multiple buildings in which they could wait pending rescue. The fan house is warm all year round when the fan is running, includes first aid and communication equipment, and would fit all the escaping miners. *Id.* at 2211. And when conditions are favorable, a helicopter could transport the miners to medical care. As an alternative, the miners could traverse the cattle trail to the gravel road or the path to the top of the canyon to the Forest Service road for medical transportation. Miners can evacuate safely from the 4 East Fan Portal and thus it is at least minimally suitable. Therefore, the Secretary was required to make a comprehensive comparison between the two proposed escapeways before selecting the most acceptable.

And because the 4 East Fan Portal is at least minimally suitable, the ALJ's finding that the West Lease Portal escapeway is the most acceptable is not supported by substantial evidence. The record lacks any meaningful comparison by the

Secretary of the two alternate escapeways: the 4 East Fan Portal escapeway and the West Lease Portal escapeway. Instead, the Secretary presented evidence at the administrative hearing focused on the difficulty of evacuating miners from the ledge at the 4 East Fan Portal, almost to the exclusion of evidence about the comparative underground conditions of the two proposed alternate escapeways. *See, e.g.*, Joint App. at 8 (opening statement of Alicia Truman: "[A]lthough that route may be the shortest, most direct way to a mine exit, it did not lead to a mine opening suitable for the safe evacuation of miners."); *id.* at 16, 20 (testimony of Mr. Riley: "Q: And why do you believe that the 4 East fan portal is not mine opening [*sic*] suitable for the safe evacuation of miners? A: Because once miners would come out there, there is no reasonable means to get the miners, including disabled miners, off of the canyon edge," and "[T]his 4 East ledge is not suitable for the safe evacuation of miners."); *id.* at 45 (testimony of James Preece: "Q: Okay. After personally viewing the portal area to the 4 East fan, did you form any opinions as to whether that mine exit was suitable for the safe evacuation of miners? A: I did. Q: And what conclusion did you draw? A: It would not be suitable."). Indeed, at various times, the Secretary compared its proposed alternate escapeway with the *primary* escapeway, rather than with the 4 East Fan Portal route. *See, e.g.*, *Id.* at 39 (testimony of Mr. Riley: "Q: . . . How does that distance compare to if miners now had to carry an injured miner out of the mine's primary escapeway? A: It would be the same distance."); Appellee's Br. at 52 ("The West Lease route is longer than the 4 East Fan route, but it is no longer than

36

the primary escapeway route."). But in so doing the Secretary has improperly omitted half of the required analysis.

The failure to make a comprehensive comparison between the two proposed escapeways can also result in misleading information. For example, the distance to potential medical transportation between the two routes is much closer than the Secretary argues: for the 4 East Fan Portal route, miners must travel between 6 and 7 miles (2.34 miles underground and between 4 and 5 miles on the cattle trail) and for the West Lease Portal route, miners must travel 5.88 miles (all underground).[12] Contrary to the Secretary's assertions, the proper comparison is not between immediate evacuation at the West Lease Portal and a four to five mile trek at the 4 East Fan Portal. Instead, selection of the most acceptable escapeway requires careful assessment of the entire escape odyssey—from the moment of the hypothetical mine emergency to the provision of medical services to the evacuated miners. To be sure, substantial evidence supports a finding that the *surface* conditions at the 4 East Fan Portal are less suitable than the corresponding surface conditions at the West Lease Portal. But that is only part of the analysis: the regulation requires consideration of those limitations in conjunction with whatever advantages or disadvantages the 4 East Fan Portal route may offer within the mine, and then a comparison of those pros and cons with the same information about the Secretary's preferred alternate route—

---

[12] The only evidence comparing this aspect of the two routes is that the four to five mile trek after exiting the 4 East Fan Portal would take *two* hours without snow or injury while the West Lease Portal escapeway would take *three* hours without an emergency or injury. This is, of course, assuming that a helicopter would be unable to rescue the miners from the 4 East Fan Portal.

the West Lease Portal. The evidence necessary to make this comparison simply was not presented to the ALJ.

It is uncontroverted that the 4 East Fan Portal is the "most direct" route out of the mine. *See, e.g.*, Joint App. at 8 (opening statement of MSHA: "[A]lthough [the 4 East Fan Portal route] may be the shortest, most direct way to a mine exit . . ."); *id.* at 31 (testimony of Mr. Riley: "It is the shortest route out. . . . I would say it's the most direct route out."); *id.* at 58 (testimony of Sydel Yaeger: Q: . . . [T]he quickest—the shortest route out from 5 West is to come out the 4 East portals, isn't that right? A: Yes. Q: And it's the most direct; isn't that right? A: Well, yeah, shortest, direct."). And the objective indicators of the "difficulty" of traversing the paths suggest that the 4 East Fan Portal route, *at least while underground*, may also be the most practical and safe. It "is shorter, requires fewer SCSRs to be available, and requires fewer overcast crossings." Appellee's Br. at 53. Furthermore, it has fewer turns than the proposed West Lease Portal route, which has "some turns." *Id.*

The Secretary made little effort to present evidence comparing the underground conditions of the two escapeway routes. Instead, the Secretary presented evidence of the proposed alternate escapeway in isolation and, to some extent, in comparison with the primary route or with the above-ground conditions at the 4 East Fan Portal. For example, while there is evidence that the proposed West Lease Portal escapeway could be traversed in three hours under ideal conditions, *Canyon Fuel I*, 38 FMSHRC at 2212, there is no evidence of how long it would take to traverse the 4 East Fan Portal escapeway in similar conditions, or how long *either* route would take

38

in an emergency. Because the 4 East Fan Portal route is over 3.5 miles shorter than the West Lease Portal route, and contains fewer turns, overcasts, and SCSR change-outs, that information might well have impacted the ALJ's analysis.

The record did not permit the ALJ to assess the advantages of traveling the 4 East Fan Portal route as opposed to the West Lease Portal route, if any. And because of that gap, the ALJ never weighed the benefits of exiting the mine more quickly along the 4 East Fan Portal route, with a potentially indeterminate wait for transportation to medical facilities at the mine opening, against the benefits of receiving medical care more quickly, but first enduring a longer and possibly more difficult journey to exit the mine. Depending on the circumstances, attaining the surface quickly may be of paramount importance, whereas in other instances the opposite may be true. Compare for example a situation where the air within the mine has become contaminated by methane gas, with a situation where an isolated collapse has blocked the main escapeway and caused life-threatening injuries to one or more miners. In the first case, the fastest route to the surface may be preferable, even if the wait for medical care at the mine opening is longer. In contrast, where significant medical attention is needed, as in the second example, the ability to transport the miners quickly to a medical facility may be most important. In sum, mining disasters come in different forms and it is no small burden to predict whether the next emergency would be best served by the fastest route to the surface or the fastest route to medical services. Had the ALJ been presented with and considered all the relevant facts, it would not be our place to second guess his decision with respect to that

39

difficult choice. But the record did not allow for such a comprehensive analysis. As a result, the ALJ's finding that the West Lease Portal escapeway is more acceptable than the 4 East Fan Portal escapeway is not supported by substantial evidence.[13]

### III. CONCLUSION

We AFFIRM the Secretary's interpretation of the regulation. Because substantial evidence does not support the ALJ's finding that Canyon Fuel violated the regulation, we REVERSE the decision of the ALJ and VACATE the citation.

---

[13] Nothing in our decision is intended to suggest that the 4 East Fan Portal escapeway is more acceptable than the West Lease Portal escapeway. Nor do we imply that, with the proper evidentiary record, the Secretary could not establish a violation of the regulation at the Sufco Mine. The potential for miners, including those seriously injured in the process of escaping an underground disaster, to be trapped on a ledge in cold or snowy weather is legitimate cause for concern. But any decision that another escapeway is more acceptable must be based on an evidentiary record that permits a comparison of the relative practicality of the proposed route, as well as the suitability of the mine opening.